# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————— )
PETER L. KNOX, as attorney-in-fact for ) 
Margaret A. Knox under power of attorney, )
                               )
        **Plaintiff,** )
                               )     **Civil Action No.**
        **v.** )     **15-13411-FDS**
                               )
THE VANGUARD GROUP, INC.; )
VANGUARD FIDUCIARY TRUST )
COMPANY; and VANGUARD MARKETING )
CORPORATION, )
                               )
        **Defendants.** )
———————————————————————— )

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO STRIKE AND CROSS-MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a dispute concerning the handling of an individual retirement account ("IRA"). Plaintiff Peter Knox, acting as attorney-in-fact for his mother, Margaret A. Knox, alleges that defendants The Vanguard Group, Inc.; Vanguard Fiduciary Trust Company; and Vanguard Marketing Corporation (collectively, "Vanguard") improperly refused to comply with his instructions concerning his mother's account. Jurisdiction is based on diversity of citizenship.

At the heart of this dispute is a seemingly trivial disagreement over the execution of the paperwork necessary to distribute the funds from an IRA.

Peter Knox is the son of Kenneth and Margaret Knox. He is a lawyer who lives in Massachusetts; his mother is elderly and lives in Ohio. In 2009, Peter obtained a general power of attorney from his mother that permitted him to conduct her financial affairs.

Kenneth Knox had an IRA at Vanguard. When he established the account in 1999, Kenneth named his wife Margaret as the beneficiary in the event of his death. Kenneth died in 2012, at which point the IRA had a balance of more than $44,000.

After Kenneth's death, at Peter's request Vanguard created a new IRA account in Margaret's name and transferred the funds to that account. Peter was unhappy with the way Vanguard handled the transfer, and attempted—using the 2009 power of attorney—to withdraw the funds in order to transfer them to a new account at Fidelity Investments.

From that point, things became problematic. In essence, Vanguard insisted that Peter use its own power-of-attorney form, and otherwise comply with its requirements, in order to have access to Margaret's account. Because Peter had signed his mother's name to a document naming him as beneficiary, Vanguard became suspicious, and insisted on strict enforcement of its policies. Peter insisted that his own documentation was sufficient. Neither party was willing to yield. As a result, the funds were not distributed for more than three years. Because nothing was distributed during that time, Margaret suffered various adverse tax consequences and other alleged financial injuries.

Peter, as attorney-in-fact for his mother, has moved for summary judgment on Counts 3 (breach of fiduciary duty) and 5 (consumer fraud), and Vanguard has cross-moved for summary judgment on all counts. In addition, Peter has moved to strike two exhibits offered by Vanguard in support of its motion.

The principal questions before the Court are (1) whether there was a contract that allowed Vanguard to impose its own requirements on the distribution of funds to someone who is not the named account holder; (2) whether Vanguard breached the terms of that contract; (3) whether Vanguard violated the implied covenant of good faith and fair dealing; and (4) whether

Vanguard otherwise acted improperly.  For the reasons set forth below, the Court concludes that such a contract existed, that it was not breached, and that Vanguard cannot be held liable on any other theory of recovery.  Plaintiff's motion to strike and motion for partial summary judgment will be denied, and defendants' motion for summary judgment will be granted.

## I.    Background

Unless otherwise noted, the following facts are undisputed.

### A.    Factual Background[1]

Peter Knox is the son of Margaret Knox and Kenneth Knox.  (Docket No. 65, Ex. 1 ¶ 8).  He is a tax attorney who practices in Massachusetts.  (Docket No. 94, Ex. C at 13).  He has been a member of the Massachusetts bar since 1976.  (Docket No. 65, Ex. 1 ¶ 3).  Margaret is approximately 98 years old; she has resided in Ohio since 1964 and currently lives in an assisted-living facility there.  (*Id.* at ¶ 5; Compl. ¶ 2).

The Vanguard Group, Inc.; Vanguard Fiduciary Trust Co.; and Vanguard Marketing Corporation are Pennsylvania corporations with principal places of business in that state.  (Compl. ¶ 7).  Vanguard is an investment advisor that provides mutual funds, brokerage services, asset management services, and a variety of other investment products and services.  (*Id.* ¶ 9).

In 1999, Kenneth opened an IRA account with Vanguard (the "Kenneth IRA").  (Docket No. 61, Ex. 1).  In the process of doing so, he executed an IRA Adoption Agreement (the "IAA").  (*Id.*).[2]  By signing the IAA, Kenneth acknowledged "having received and read the Vanguard IRA Disclosure Statement."  (*Id.* at 5).  In addition, by signing the IAA, Kenneth

---

[1] Because the parties have filed hundreds of exhibits, many of which have confusingly similar labels, the Court will generally cite to the specific docket entry.

[2] Plaintiff disputes the relevance of the IAA, which is a subject of his motion to strike.  However, the content of the IAA is undisputed.

agreed to the terms of the standard Vanguard Individual Retirement Custodial Account Agreement, which was incorporated by reference.  (*Id.*).  The IRA Disclosure Statement and the IRA Custodial Account Agreement are contained in a single continuously paginated document, and will be referred to for convenience as the "1999 CAA."  (*Id.*, Ex. 2).[3]

The IAA provided that "Vanguard will transfer ownership of your IRA to your primary beneficiaries following your death."  (*Id.*, Ex. 1 at 4).  When he opened the account, Kenneth named Margaret as the sole beneficiary.  (*Id.*).

The 1999 CAA provided that Vanguard "is authorized to amend the Agreement in any respect and at any time . . . to comply with the applicable provisions of the [Tax] Code" and that "[a]ny other amendment . . . shall require the consent of [Vanguard] and the Depositor."  (*Id.*, Ex. 2 at 32).  It continues:  "[f]or these purposes, the Depositor shall be deemed to have consented to any amendment . . . if [he] fails to object thereto within 30 days after having received written notice of the amendment."  (*Id.*).

By the time Kenneth died in 2012, the 1999 CAA had been amended.  Section 4.1(b) of the 2012 version (the "2012 CAA") provided that "[t]he Investor's or Beneficiary's request [for distribution of account assets] must be made in a form and manner acceptable to [Vanguard]."  (*Id.*, Ex. 3 at 19).  Section 4.5(b) likewise provided that "[Vanguard] shall not have any responsibility to make any distribution . . . until it receives . . . directions [from the Investor or Beneficiary] in form and manner acceptable to [Vanguard]."  (*Id.* at 22).[4]

---

[3] Plaintiff also disputes the relevance of the 1999 CAA, which is the subject of the motion to strike. However, the content of the document is undisputed.

[4] A version of that requirement—that a request for distribution or transfer of assets must be in a form and manner acceptable to Vanguard—appears six times in the 2012 CAA, under the headings "Distribution of Accounts – General Requirements" (Section 4.1(b)), "Distribution upon Death:  Traditional IRAs and Roth IRAs" (Section 4.3), "Designation of Beneficiary – General Rules" (Section 4.4(a)), "Responsibility of Custodian and Vanguard – Distributions" (Section 4.5(b)), "Responsibility of Vanguard – Additional Information" (Section 4.5(d)), and "Transfers to/from Account" (Sections 5.1 and 5.2).  (Docket No. 61, Ex. 3 at 19-22).

Vanguard generally requires that requests for distributions from accounts be executed on its own forms. (*Id.*, Ex. 7-9).[5]  It has specific forms and requirements when the person requesting the distribution is not the account holder, and is acting under a power of attorney or similar grant of authority. (*Id.*, Ex. 8).  It will accept externally drafted powers of attorney on a transaction-by-transaction basis, subject to its own determination that the person in fact has the authority to act on behalf of the account holder. (*Id.* at 2).  It requires, under some circumstances, that such a power of attorney be certified independently (such as by outside counsel) that it is valid and in force. (*Id.*).  According to Vanguard, its policies and requirements have been established in order to protect itself, its account holders, and the rightful beneficiaries of those accounts from potential fraud. (Defs.' SMF ¶ 17).

On May 7, 2009, in Ohio, Margaret signed a 2009 Durable General Power of Attorney (the "2009 DGPOA") appointing Peter as her attorney-in-fact. (Docket No. 65, Ex. 33 at 5-6). The 2009 DGPOA in essence provided that Margaret granted to Peter the authority to perform any action on her behalf that she could personally perform. (*Id.*).  That authority specifically included the power to "sign checks, withdraw funds, and to open and close and manage bank, brokerage, mutual fund, and other retirement accounts." (*Id.* at 5).

On September 30, 2009, Peter sent Vanguard a letter enclosing a copy of the 2009 DGPOA. (*Id.*, Ex. 8).  Peter had apparently obtained a copy of Vanguard's standard Agent Authorization form, but declined to execute the form. (*Id.*).  According to his letter, Peter believed that the 2009 DGPOA was sufficient to authorize any of the actions that Vanguard's

---

[5] Examples of relevant Vanguard forms include an Agent Authorization Form, a Power of Attorney Form, and an Agent Certification for Incapacitated Person Form.

form would authorize. (*Id.*).[6]

On September 30, 2012, Kenneth died. At that point, the Kenneth IRA held investments totaling approximately $44,896. (Compl. ¶ 19).

On October 2, 2012, after Kenneth's death, Peter called Vanguard employee Joseph McHugh to discuss transferring the assets in the Kenneth IRA to an inherited IRA in Margaret's name. (Docket No. 65, Ex. 6).[7] McHugh told Peter that he would send the necessary forms to him to effect the transfer, including a Vanguard Agent Authorization form. (*Id.* at 36-37). McHugh further told him that in Vanguard's view, the 2009 DGPOA was good only for "a one-time transaction" and that if he wanted "permanent or ongoing authority" for Margaret's account, he would need "to complete an agent authorization." (*Id.* at 35-36).[8] During the October 2 phone call, McHugh acknowledged that Peter had been granted a power of attorney under the 2009 DGPOA, but stated if Vanguard did not have an executed Agent Authorization form on file, it could not accept his signature in lieu of Margaret's. (*Id.*).

Vanguard then sent its IRA application package to Margaret to effect the transfer of the Kenneth IRA assets to a new inherited IRA in Margaret's name. (*Id.*, Ex. 1 ¶ 10; Ex. 11). The package was sent to Margaret's address of record, which was Peter's address in Massachusetts. (*Id.*). The Inherited IRA Form, which was part of the package, required the new account owner to sign the form and to confirm, among other things, "that I am signing below to identify myself as the beneficiary of the account(s)." (*Id.*, Ex. 9 at 7).

---

[6] Peter's September 30, 2009 letter stated that the power of attorney executed by Margaret "authorize[s] ALL of the actions which [Vanguard's] 'Agent Authorization' would authorize under 'Option A—Full Agent.'" (Docket No. 65, Ex. 8).

[7] The call was recorded, and therefore there is no dispute as to its content.

[8] That policy was later affirmed in a letter dated November 16, 2012. (Docket No. 65, Ex. 30 at 4).

Peter received the package at his address.  (*Id.*, Ex. 1 ¶ 10; Ex. 11).  He signed

Margaret's name on the forms.  (*Id.*, Ex. 1 ¶ 16).  However, he did not indicate on the forms that

he was signing her name in his capacity as her attorney or agent.  (*Id.* ¶ 18).  He named himself

and his sister as the beneficiaries on the account.  (*Id.*, Ex. 9 at 5).[9]  He then mailed the forms to

Vanguard on October 30, 2012.  Because Peter believed that Vanguard had the 2009 DGPOA on

file, he did not include another copy.  (*Id.*, Ex. 1 ¶¶ 21-24).

The Inherited IRA Form executed by Peter on behalf of Margaret included the following

language:  "I have elected to inherit/assume the IRA(s) of the decedent  . . . and I agree to the

terms set forth in this Inherited/Assumed IRA Form for Spouse Beneficiaries.  I hereby adopt the

[2012 CAA] that is incorporated herein by reference and that I acknowledge having received and

read."  (*Id.*, Ex. 9 at 7).

In the package that he mailed to Vanguard, Peter included a Vanguard IRA Distribution

Form.  (*Id.*, Ex. 10).  Although the form indicated that it was not to be used "to establish required

minimum distributions," Peter handwrote various instructions and alterations on the form,

including the notation, "minimum required distribution based on inherited DOB."  (*Id.* at 2-3).

He signed his mother's name to the form.  (*Id.* at 8; Ex. 1 ¶ 28).

On November 2, 2012, Vanguard received the forms from Peter.  That day, Vanguard

electronically created an inherited IRA account titled "Margaret A. Knox BENEF Kenneth L.

Knox" (the "Margaret IRA").  (Compl. ¶ 29).  All of the funds in the Kenneth IRA were then

transferred to the Margaret IRA.  (Docket No. 65, Ex. 12).[10]

---

[9] Peter and his sister would both receive 50% of the assets, with right of survivorship.

[10] There were several errors with the new Margaret IRA account.  (Docket No. 65, Ex. 15 at 4).  Peter
contends that Vanguard had the wrong date of birth and e-mail address for Margaret.  (Pl.'s SMF ¶ 56).  In addition,
Peter contends that Vanguard did not state the correct beneficiaries in its "Confirmation of New Account"
notification.  (*Id.*).

On November 5, 2012, McHugh called Peter. (*Id.*, Ex. 15). McHugh advised him that his handwritten notations on the IRA Distribution Form were unclear. (*Id.* at 12). Peter expressed frustration with what he perceived to be Vanguard's delays and repeated mistakes, and indicated that he wanted to transfer all of the funds in the Margaret IRA to a new account at Fidelity Investments. (*Id.* at 27-28). He therefore requested that Vanguard make a distribution of all of the funds in the Margaret IRA. (*Id.* at 18). McHugh advised him that he could send written instructions with a power of attorney, and that if it was in good order, the transaction would be processed. (*Id.* at 23).[11]

After the conversation with McHugh, Peter e-mailed written trade instructions to Vanguard. (*Id.*, Ex. 16). He attached the 2009 DGPOA, but without any form of certification. (*Id.*).

The following day, November 6, Vanguard issued check no. 19198616 in the amount of $44,504.12 payable to "MARGARET A. KNOX BENEF KENNETH L. KNOX" and mailed it to Margaret's address of record (that is, Peter's address in Massachusetts). (*Id.*, Ex. 63). However, on November 7, Vanguard stopped payment on that check. (*Id.*, Ex. 20). Vanguard then returned the $44,504.12 distribution to the account. (*Id.*, Ex. 22-23).

Vanguard contends that after the check had been issued it had determined that the uncertified 2009 DGPOA was insufficient authorization to process the transaction. (*Id.*, Ex. 23).[12] At some point, Vanguard's Fraud Prevention Department had become involved, and expressed concern that Margaret herself had not signed the Inherited IRA form and that one of

---

[11] During that conversation, McHugh conferenced Margaret into the phone call, and she stated to Peter, "you take care of everything for me. Thank you, Pete." (Docket No. 65, Ex. 15 at 25).

[12] In an internal e-mail, Vanguard employee Sarah Foster stated that the distribution check was stopped "because the proper procedures weren't followed" and that "Peter signed the Inherited/Assumed IRA for Spouse Beneficiaries Form on behalf of his mother." (Docket No. 65, Ex. 23 at 2).

the named beneficiaries, Peter, had instead signed her name. (*Id.*, Ex. 22).[13]   On November 7, Vanguard froze the Margaret IRA account. (*Id.*).

On November 12, 2012, Vanguard employee Patrick Rogan telephoned Peter and informed him that the check had been stopped because Vanguard believed that the proper procedures had not been followed. (*Id.*, Ex. 25 at 5).  He stated that the 2009 DGPOA was ineffective because "the power of attorney would [need to] be certified by an authorized officer of a commercial bank . . . [or] brokerage firm or a practicing attorney, which could not be you . . . ." (*Id.* at 19).  During the call, Peter acknowledged that Margaret had not actually signed the forms to open the inherited IRA.  He told Rogan, "I signed it for her under the power of attorney.  She's not here.  She lives in Cincinnati and I take care of this stuff." (*Id.* at 18).

In that conversation, and in a subsequent e-mail sent on November 13, 2012, Rogan advised Peter that Vanguard would not accept his signature on the Inherited IRA Form. (*Id.* at 19; Ex. 27).  In the November 13 e-mail, he stated that "we would encourage you and your mother to complete the Vanguard Agent Authorization Form to avoid any potential delays in sending in a certified power of attorney," and that "[y]our mother can designate you as a full or limited agent, and it requires your mother to receive a notarized signature." (*Id.*, Ex. 27).  He also noted that because Peter had signed his mother's name to the Inherited IRA Form, his mother would need to sign a new copy of that form, and that Vanguard would not accept his signature even if he completed the Agent Authorization Form. (*Id.*).  Rogan attached blank copies of the two forms to the e-mail. (*Id.*).

On November 15, Rogan sent Peter another e-mail, in which he noted that Peter had

---

[13] In an internal e-mail, Vanguard fraud investigator Celeste Rogers requested the stop "until [Vanguard could] determine whether the Inherited IRA was opened in good order by Margaret Knox." (Docket No. 65, Ex. 22 at 2).

"admitted" to signing the Inherited IRA Form for his mother, and that "[a]s a result, we must receive a new form signed by [Margaret] before any distributions or transfers out of Vanguard could occur." (*Id.*, Ex. 26 at 2). The e-mail explained Vanguard's policy with regard to powers of attorney and indicated that an externally prepared power-of-attorney form could be used, but would need to be certified each time and would be subject to Vanguard's internal approval. (*Id.*). Rogan also advised that he had sent blank copies of the Agent Authorization Form and the Inherited IRA Form for Peter and his mother to execute. (*Id.* at 3).

On November 16, 2012, Rogan sent Peter a letter that essentially repeated the contents of the two e-mails. (*Id.*, Ex. 30 at 4). Among other things, the letter repeated that Margaret needed to sign the Inherited IRA Form, and suggested that Peter should fill out a "Vanguard Agent Authorization Form" so he could have "ongoing authority" to manage Margaret's account. (*Id.*). Alternatively, Peter could use a power of attorney that had been certified. (*Id.* at 5). However, Vanguard would only accept certified externally drafted powers of attorney for one-off transactions because they vary greatly and state laws differ in interpreting durable powers of attorney. (*Id.*). Vanguard "require[d] a new certification with each [DGPOA] submission" to ensure that the power of attorney was still in effect. (*Id.*).

In response, on November 17, 2012, Peter sent another letter to Vanguard that simply included a copy of the 2009 DGPOA. (*Id.*, Ex. 40). Again, however, the 2009 DGPOA was not accompanied by a current certification that it remained valid. (*Id.*; Defs.' Resp. ¶ 85).

On November 22, 2012, Peter mailed a signed letter to Vanguard demanding immediate payment of funds held in the Margaret IRA. (Docket No. 65, Ex. 33). The letter itself was purported to have been signed by Margaret. (*Id.* at 4). The letter did not include an executed copy of the Inherited IRA Form.

On December 4, 2012, Peter wrote to Vanguard stating that Margaret's distribution needed to occur during the current tax year to avoid significant penalties. (*Id.*, Ex. 34 at 4). The letter included another copy of the 2009 DGPOA, which again was not certified. (*Id.* at 5-6). Instead, Peter simply stated that "[y]ou may rely on my representation that this DGPOA remains in full force and effect." (*Id.* at 4).

Rogan replied in a letter dated December 7, 2012, reiterating that Margaret had to sign the relevant Vanguard forms before Vanguard would "update her beneficiaries, or process a monetary transaction or asset transfer." (*Id.*, Ex. 52 at 2). Peter sent follow-up e-mails on December 13 and 19, 2012, stating that "[t]he tax consequences of [Vanguard's] delaying the IRA distribution beyond the end of 2012 are horrendous." (*Id.*, Ex. 35 at 3-4; Ex. 36 at 3).

Throughout this process, Peter never advised Vanguard that his mother was incompetent or otherwise unable or unwilling to execute the necessary forms. He did have his mother sign her name to at least one letter (on November 22, 2012) and at least one Vanguard form, as set forth below (on February 3, 2013). At no point did he request that his mother execute the Inherited IRA Form or the Agent Authorization Form, as Vanguard had requested.[14]

On December 21, 2012, Vanguard employee Brian Arletti wrote a letter to Peter stating that if Margaret was unable to complete and sign the relevant forms, Peter would have to submit an Agent Certification for Incapacitation Form including both a valid durable power of attorney along with a physician's certification of incapacity. (*Id.*, Ex. 32 at 7). In addition, if the durable power of attorney did not state the authority for the request, Vanguard would require an opinion

---

[14] Peter now contends that "I had concerns about my mother's competency to understand complex legal documents, such as the Vanguard IRA Application Kit and forms," and that he "was not willing to compromise [her] dignity and quality of life by seeking to declare her incompetent simply to meet Vanguard's unnecessary and unreasonable demands . . . which appeared to me to be made solely for Vanguard's benefit." (Docket No. 65, Ex. 1 at ¶ 52, 55).

letter from an attorney. (*Id.*).

On February 15, 2013, Peter sent Vanguard an executed IRA Distribution Form, accompanied by a letter from Margaret instructing Vanguard to cash out the Margaret IRA. (*Id.*, Ex. 38, 39). The IRA Distribution Form, as submitted to Vanguard, sought distribution of all of the funds in the Margaret IRA in the form of a check made payable to her at her address of record. (*Id.*, Ex. 38 at 4). It was filled out by hand, with a variety of provisions crossed out. It contained three signatures: (1) "Margaret A Knox by Peter L Knox as her attorney in fact"; (2) "Margaret A Knox by Peter L Knox as her [illegible]"; and (3) "Margaret A. Knox." (*Id.* at 8). Under the latter signature is written the inscription, "Margaret A. Knox, by her own hand"; next to it is the date "Feb. 3, 2013." (*Id.*). Peter contends that the signature is that of his mother.[15]

Peter sent additional letters to Vanguard between March 1, 2013, and November 21, 2014. (*Id.*, Ex. 46-50). However, no distributions were made from the Margaret IRA during that interval. (*Id.*, Ex. 1 at ¶ 61).

Peter called Vanguard again on November 11, 2014, and spoke with Vanguard employee Subbu Chetty. (*Id.*, Ex. 51). Chetty stated that he had no knowledge of Peter's situation and that he could not take further action on the Margaret IRA without speaking to Margaret herself. (*Id.* at 16). Because Margaret was not on the call, no action was taken.

On September 22, 2015, Peter filed the complaint in this case.

On December 29, 2015, Peter e-mailed Vanguard, again requesting that the Margaret IRA be liquidated. (*Id.*, Ex. 55). The e-mail demanded Vanguard distribute the funds to The

_____

[15] The Vanguard IRA Distribution Form required that under certain circumstances a "signature guarantee" needed to be obtained, which the form indicated could be obtained from "an authorized officer of a bank, broker, and many other financial institutions." (Docket No. 65, Ex. 38 at 8). Such a guarantee was not required, however, for a check payable to the account owner. (*Id.*).

Margaret Knox Trust, and "[p]urchase additional shares . . . in said trust account." (*Id.* at 2).[16]

Several e-mails were exchanged with William Taylor, Vanguard's counsel in this litigation, on December 29, 2015. (*Id.*, Ex. 57).[17] The following day, Peter e-mailed a document certified by himself stating that the 2009 DGPOA was still effective. (*Id.*, Ex. 58 at 2-3). At that point, Vanguard complied with the demand. It liquidated the assets held in the Margaret IRA and transferred the funds to the Vanguard account of the Margaret Knox Trust. (*Id.*, Ex. 1 ¶ 69). Vanguard later explained that it made the distribution on December 30, 2015, because by then Peter had "complied with Vanguard's procedures and provided a properly certified power of attorney." (*Id.*, Ex. 4 ¶ 14).[18]

Because 2012 was the final year in which Margaret could file a joint tax return with her late husband, she could have deducted his medical expenses (which were considerable) from their income. (*Id.*, Ex. 1 ¶¶ 73-74). Had Vanguard granted Peter's original request in 2012, Margaret's taxes on the distribution would have totaled $1,827. (*Id.* ¶ 75). Instead, the funds were distributed in December 2015, by which time the IRA had appreciated in value to $68,699. (*Id.* ¶ 80). Because she could no longer take advantage of the tax deductions from 2012, her tax burden increased by more than $25,000.[19]

In addition, Margaret had not taken required minimum distributions from the Margaret

---

[16] The Margaret Knox Trust is a revocable estate-planning trust established in 1980. (Docket No. 65, Ex. 1 ¶ 65). The trust had an account at Vanguard, and from October 2012 onward, the account had in excess of $778,000 in assets. (*Id.*). Peter was a trustee on that account under a Vanguard Trustee Certification, and thus his access to the trust account was never restricted. (*Id*. ¶¶ 66-67).

[17] Vanguard disputes the admissibility of the content of these e-mails, contending that they were "compromise negotiations" because by this point Peter had filed suit. (Defs.' Resp. ¶¶ 114-17).

[18] Although Peter had been told earlier that he could not self-certify the 2009 DGPOA, it appears that by 2015 Vanguard was willing to waive that condition.

[19] Peter alleges that Margaret's tax burden increased by $25,695; Vanguard alleges that her tax burden increased by $25,631. (Pl.'s SMF ¶ 129; Defs.' Resp. ¶ 129).

IRA for tax years 2012, 2013, and 2014. Peter alleges that the total tax penalty for the missed distributions was $12,819. (*Id.* ¶ 81). However, he also appears to concede that the IRS usually does not assess penalties in such cases past here years. (Docket No. 62, Ex. C at 200-02).

## B. Procedural Background

On September 22, 2015, Peter Knox, acting as attorney-in-fact for Margaret Knox, filed a five-count complaint against Vanguard. The complaint brought claims for breach of express contract and breach of the implied covenant of good faith and fair dealing (Count 1); negligence (Count 2); breach of fiduciary duty (Count 3); declaratory judgment (Count 4); and consumer fraud in violation of Mass. Gen. Laws ch. 93A and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 201 (Count 5).

On January 14, 2016, Vanguard moved to dismiss all counts under Fed. R. Civ. P. 12(b)(6). This Court granted the motion in part, dismissing Count 4. (Docket No. 25).

## III. Motion to Strike

Plaintiff has moved under Fed. R. Civ. P. 37 to strike two exhibits that defendants offered in support of their motion for summary judgment: the IRA Adoption Agreement (again, the "IAA") executed by Kenneth in 1999 and the 1999 version of the IRA Disclosure Statement and IRA Custodial Account Agreement (again, the "1999 CAA").[20] Because the disposition of the motion to strike will affect the evidentiary record, the Court will resolve it first.

Plaintiff contends that the disputed documents were concealed by Vanguard until immediately before the deadline for filing motions for summary judgment.[21] He further alleges

---

[20] As also noted, the 2012 iterations of the Disclosure Statement and Custodial Account Agreement will collectively be referred to as the "2012 CAA".

[21] The deadline for filing motions for summary judgment was June 12, 2017. The documents were disclosed on June 8, 2017.

that the documents should have been included in Vanguard's initial Rule 26(a) disclosures.

Rule 37(c)(1) provides as follows: "If a party fails to provide information . . . as required by Rule 26(a) . . . the party is not allowed to use that information . . . unless the failure was substantially justified or is harmless."  Rule 37(c)(1) contemplates strict adherence to the discovery requirements; furthermore, "the required sanction in the ordinary case is mandatory preclusion" of the untimely disclosed information.  *Klonoski v. Mahlab*, 156 F.3d 255, 269 (1st Cir. 1998).  However, Rule 37(c)(1) contains a "narrow escape hatch" that allows courts to admit untimely evidence if the proponent's failure to reveal it was either substantially justified or harmless.  *Lohnes v. Level 3 Comms., Inc.*, 272 F.3d 49, 60 (1st Cir. 2001).  Vanguard, as the party that purportedly failed to make discovery, carries the burden of proving substantial justification or harmlessness.  *See Alves v. Mazda Motor of Am., Inc.*, 448 F. Supp. 2d 285, 293 (D. Mass. 2006).

Vanguard contends that its disclosure was timely because Rule 26(a) only mandates disclosure of documents a party intends to use, and it did not intend to use the two documents in question until after plaintiff questioned the applicability of the 2012 CAA.  Under the circumstances, that is certainly a plausible argument.  However, even assuming the disclosure was untimely, Vanguard was substantially justified in producing the two documents when it did.

It was plaintiff's position until June 6, 2017, that the "express custodial contract formed in October of 2012, between Margaret A. Knox and Vanguard . . . pursuant to Vanguard's Custodial Account Agreement" controlled the outcome of this suit.  (Docket No. 62, Ex. B at 1).[22]  However, that day, plaintiff submitted an amended response to defendants' interrogatories

---

[22] The complaint also alleges that Vanguard "breached its Custodial Account Agreement with Mrs. Knox," implying that the 2012 CAA governed the relationship between Vanguard and Margaret Knox.  (Compl. ¶¶ 45-53).

stating that "[w]hether or not the contract was formed and/or is enforceable by either or both parties are questions of law to be decided by the Court . . . as a matter of law, the Court should conclude that no contract was formed or can be enforced by Vanguard since acceptance is a basic element that must exist in order to form a contract." (Docket No. 82, Ex. A at 1-2). In essence, plaintiff made a last-minute change to his theory of the case by contesting whether any contract had ever been created. Therefore, Vanguard was substantially justified in producing the two contested documents to rebut plaintiff's new contention. *See Massachusetts Mut. Life Ins. Co. v. DB Structured Prods., Inc.*, 2015 WL 12990692, at *4 (D. Mass. Mar. 31, 2015) (finding party's late disclosure justified because "it only became aware of the . . . argument to which the new material responds" after being prompted by opposing party's filing of motions).

Furthermore, and in any event, it is difficult to see what prejudice resulted from the late disclosure. As set forth below, the 2012 CAA is the controlling contract. The relevant sections of the 1999 documents are brief and not difficult to read; they were produced before the summary judgment deadline; and plaintiff did not request any additional time to respond. Accordingly, the late disclosure (assuming it was, in fact, late) was harmless. The motion to strike will therefore be denied.

## IV. Cross-Motions for Summary Judgment

### A. Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

16

R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational fact finder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256–57.

    **B.**    <u>**Analysis**</u>

        **1.**    <u>**Breach of Contract (Count 1)**</u>

Count 1 alleges that Vanguard breached "its Custodial Account Agreement with [Margaret] Knox."  (Compl. ¶¶ 47-53).  The parties agree that to the extent a contract was formed, it is governed by Pennsylvania law.  "It is well-established that three elements are necessary to plead a cause of action for breach of contract:  (1) the existence of a contract, including its essential terms, (2) a breach of the contract, and (3) resultant damages."  *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 635 Pa. 427, 445 (2016).

        **a.**    <u>**Whether There Is an Enforceable Contract**</u>

Since the complaint was filed, plaintiff has shifted his position and now denies that any contract governs the rights and obligations of the parties as to the Margaret IRA.  (Hearing Tr. at 24-25).  Plaintiff contends, in substance, that no meeting of the minds ever occurred, because

Margaret never accepted Vanguard's terms (or, alternatively, that Vanguard never accepted the documents that would have manifested Margaret's intent to be bound). (*Id.* at 28).[23]

Notwithstanding that contention, it is beyond reasonable dispute that a binding contract was in place at all relevant times, and that the contract is the 2012 CAA. There are two potential pathways to that conclusion, both of which reach the same result.

First, Peter (on behalf of Margaret) executed the Vanguard Inherited IRA Form on October 30, 2012. By doing so, he agreed to the terms of the 2012 CAA, which were incorporated by reference. Peter can hardly claim that he did not have the authority to sign the Inherited IRA Agreement on behalf of Margaret; the entire premise of this lawsuit is that he had an unlimited and permanent power of attorney to act on behalf of his mother, and that Vanguard wrongfully refused to recognize it. Peter cannot have it both ways; either he lawfully had the power to bind his mother (and did so), or he did not (and his claims disappear).

Alternatively—and if for some reason that October 2012 agreement is not effective— Margaret was a third-party beneficiary to the 1999 contract between Kenneth and Vanguard, and she is therefore bound by its terms. Pennsylvania law provides a two-part test for determining whether an individual is a third-party beneficiary. First, "the recognition of the beneficiary's right must be 'appropriate to effectuate the intention of the parties,'" and second, "the performance must 'satisfy an obligation of the promisee to pay money to the beneficiary' or 'the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.'" *Ruger v. QBE Ins. Corp.*, 2013 WL 11266161, at *3 (Pa. Sup. Ct. Apr.

---

[23] Under Pennsylvania law, there are three elements to create of an enforceable contract: (1) a manifestation of intent by both parties to be bound by the terms of the agreement; (2) sufficient definiteness of the terms; and (3) the existence of consideration. *Johnston the Florist, Inc. v. TEDCO Const. Co.*, 441 Pa. Super. 281, 291 (1995).

12, 2013) (quoting *Guy v. Liederbach*, 501 Pa. 47, 60 (1983)). Furthermore, "a party becomes a third-party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself." *Scarpitti v. Weborg*, 530 Pa. 366, 372-73 (1992).

The parties do not dispute that when Kenneth opened his IRA in 1999, he entered into a binding contract with Vanguard. (Hearing Tr. at 28). That contract established that Vanguard would serve as custodian for a traditional IRA for the benefit of Kenneth and his beneficiaries.[24] Kenneth listed Margaret as the sole beneficiary of his IRA. (Docket No. 61, Ex. 1 at 4). It is clear that the parties intended that upon Kenneth's death, his wife would receive any remaining assets in the account, satisfying both parts of the test identified in *Ruger*. Therefore, Margaret was a third-party beneficiary and was bound by the same terms and conditions in the contract to which Kenneth had agreed. *See Gen. Accident Ins. Co. of Am. v. Parker*, 445 Pa. Super. 300, 304 (1995) ("Historically, [Pennsylvania courts have] held that third party beneficiaries are bound by the same limitations in the contract as the signatories of that contract.").[25] Accordingly, as a third-party beneficiary of the original 1999 agreement, Margaret is bound by its terms.

The Court notes that plaintiff's position—that no contract existed between Margaret and Vanguard, because they never agreed to one—would lead to absurd and unworkable results. Vanguard presumably has many thousands of customers and manages many billions of dollars of

---

[24] Section 6 of the IAA signed by Kenneth stated that both he and Vanguard would "adopt the [1999 CAA] that is incorporated herein by reference." (Docket No. 61, Ex. 1 at 5).

[25] Courts in other states have similarly held that beneficiaries to IRA accounts are third-party beneficiaries bound by the original contractual agreement. *See, e.g.*, *Citigroup Smith Barney v. Henderson*, 250 P.3d 926, 933 (Or. Ct. App. 2011) (holding that named beneficiaries were third-party beneficiaries bound by an arbitration clause contained in the account agreement); *Luszcz v. Lavoie*, 787 So. 2d 245, 248 (Fla. Dist. Ct. App. 2001) ("An IRA is a contract with an institution that involves a third-party beneficiary designation. The rights of a . . . beneficiary of an IRA arise from that contract."); *PaineWebber Inc. v. East*, 363 Md. 408, 417 (2001) (finding a named beneficiary of an IRA account should be paid "as a third-party beneficiary" of the contract).

assets. Presumably, too, some percentage of its customers pass away every year, indeed every day. Under plaintiff's view, whenever a Vanguard account holder died, there would be no contract of any kind between the beneficiaries and Vanguard; the parties would be left to negotiate their own arrangements, or perhaps no arrangement at all. Surely the result would be chaos, as well as ample opportunities for fraud and other misconduct.

In any event, there is a contract governing the relationship between Vanguard and Margaret, and (for all relevant purposes here) it is the 2012 CAA.

### b.     <u>Whether the Contract Was Breached</u>

The essence of the dispute here does not concern the transfer of funds from the Kenneth IRA to the Margaret IRA, but rather Peter's subsequent attempt to request the distribution of the contents of the Margaret IRA. As noted above, Section 4.1(b) of the 2012 CAA provides that "[t]he Investor's or Beneficiary's request [for distribution of account assets] must be made in a form and manner acceptable to [Vanguard]." (Docket No. 61, Ex. 3 at 19). Section 4.5(b) likewise provides that "[Vanguard] shall not have any responsibility to make any distribution . . . until it receives . . . directions [from the Investor or Beneficiary] in a form and manner acceptable to [Vanguard]." (*Id.* at 22).

Plaintiff argues that because the 2009 DGPOA was legally valid in all of the relevant jurisdictions (Pennsylvania, Ohio, and Massachusetts), Vanguard was required to accept it without further limitation. But the contract does not state that Vanguard must accept any legally binding power of attorney; rather, it states that a request for distribution must be made a "form and manner" acceptable to it. Vanguard was entitled under the contract to establish reasonable policies and procedures to ensure that any distributions were not fraudulent, and were made in accordance with an account holder's intent.

Vanguard had such a policy in place governing the acceptability of powers of attorney for account transactions.[26]  On November 12, 2012, Vanguard representative Patrick Rogan told Peter that the 2009 DGPOA was good for one-time transactions but would have to be certified each time "by an authorized officer of a commercial bank . . . [or] brokerage firm or a practicing attorney, which could not be you."  (Docket No. 65, Ex. 25 at 19).  Four days later, Vanguard sent a letter reiterating that same point.  (*Id.*, Ex. 30 at 4).  The November 16 letter stated that either Margaret needed to sign the relevant documents personally or Peter needed to fill out the "Vanguard Agent Authorization Form" for ongoing authority to manage his mother's account.  (*Id.*).  Alternatively, in a separate letter dated December 21, 2012, Vanguard indicated that if Margaret was truly unable to comprehend the documents necessary to effect the IRA transfer, Peter could fill out an "Agent Certification for Incapacitation Form" and attach a physician's letter certifying his mother's incapacity.  (*Id.*, Ex. 32 at 7-8).

Instead, Peter transmitted the 2009 DGPOA without certification multiple times between 2012 and 2015 in direct contravention of Vanguard's instructions.  He also declined to fill out Vanguard's Agent Authorization Form or Agent Certification for Incapacitation Form, despite acknowledging that he had "concerns about [his] mother's level of competency to understand complex legal documents, such as [Vanguard's IRA forms]."  (*Id.*, Ex. 1 ¶ 52).  In short, he did not submit a request for distribution "in a form and manner acceptable to [Vanguard]."

Under the circumstances, Vanguard's requirements were clearly reasonable and did not breach the contractual requirements.  The issue is not, of course, whether Vanguard provided good customer service to Peter, or whether it might not have found a way to resolve the dispute

---

[26] Peter alleges that Vanguard did not disclose its policies concerning power of attorney until December 2015 when he was in contact with defense counsel William Taylor.  (Pl.'s Opp. at 10).  However, that assertion is clearly contradicted by the written record, as set forth above.  In addition, Vanguard employee Joseph McHugh told Peter about Vanguard's policies in a telephone call on October 2, 2012.

in a prompt and more amicable fashion.  Nor is the issue whether Peter brought the problem

upon himself by his own stubbornness and inflexibility.  The issue is simply whether Vanguard

breached the 2012 CAA.  Because it did not, summary judgment will be granted to Vanguard as

to that claim.

> **c.** **Breach of the Implied Covenant of Good Faith and Fair Dealing**

Paragraph 52 of Count 1 alleges in general terms that Vanguard's conduct breached the

implied covenant of good faith and fair dealing.  In his opposition papers, Peter did little to

develop that argument, or to explain its basis.[27]  For that reason, the claim of breach of the

implied covenant is waived.  *See San Geronimo Caribe Project, Inc. v. Acevedo-Vila*, 687 F.3d

465, 492 (1st Cir. 2012).

Even considering the issue on the merits, the Court can ascertain no basis for upholding

the claim.  "Every contract in Pennsylvania includes an implied covenant of good faith and fair

dealing."  *Mack Trucks Inc. v. BorgWarner Turbo Sys., Inc.*, 508 Fed. Appx. 180, 185 (3d Cir.

2012) (citing *Benchmark Gr., Inc. v. Penn Tank Lines, Inc.*, 612 F. Supp. 2d 562, 583 (E.D. Pa.

2009)).  "'Good faith' has been defined as '[h]onesty in fact in the conduct or transaction

concerned.'"  *Kaplan v. Cablevision of PA, Inc.*, 448 Pa. Super. 306, 318 (1996) (quoting 13 Pa.

C.S. § 1201).  As noted, Vanguard has the contractual right to insist that any request for

distribution be made in a "form and manner" that was acceptable to it.  It was reasonable for

Vanguard to insist that such requests include basic protections against fraud and self-dealing.

And once it became aware that Peter had signed his mother's name without indicating that he

was doing so, coupled with the fact that he named himself a beneficiary on the Margaret IRA,

---

[27] In his opposition memorandum, Peter contends that "Vanguard engaged in a serious of misrepresentations . . . which are not authorized anywhere in the [1999 CAA] nor the 2012 CAA and which constituted breaches of the implied covenant of good faith and fair dealing."  (Pl.'s Opp. at 12).

Vanguard had a specific basis to suspect potential fraud. From that point, Vanguard refused to relax its requirements, and declined to follow Peter's distribution instructions until he satisfied those requirements. Its actions under the circumstances were reasonable, and did not breach the implied covenant.

Accordingly, defendants' motion for summary judgment will be granted as to Count 1.

## 2. Negligence (Count 2) and Breach of Fiduciary Duty (Count 3)

Counts 2 and 3 allege negligence and breach of fiduciary duty, respectively. Vanguard contends that both claims must be dismissed under Pennsylvania's "gist of the action" and "economic loss" doctrines.

### a. The Gist of the Action Doctrine

Under the "gist of the action" doctrine, Pennsylvania courts examine the facts of a claim to determine whether the source of the duty alleged to have been breached sounds in contract or tort law. *See generally Bruno v. Erie Ins. Co.*, 630 Pa. 79 (2014). Similarly, "[t]he economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir. 2002) (internal quotations omitted). "The two doctrines . . . are closely related." *Graham Packaging Co., L.P. v. Transplace Texas, L.P.*, 2015 WL 8012970, at *2 (M.D. Pa. Dec. 7, 2015). Where, as is the case here, the case under consideration is not a products liability case, the "gist of the action" doctrine "is a better fit." *Id.*; *accord Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 104 n.11 (3d Cir. 2001).

Under the "gist of the action" doctrine, if "'the duty breached is one created by the parties *by the terms of the contract*—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract,' then the claim should

be treated as one for breach of contract." *New York Cent. Mut. Ins. Co. v. Edelstein*, 637 Fed.

Appx. 70, 72-73 (3d Cir. 2016) (quoting *Bruno*, 630 Pa. at 112) (emphasis added). "If, however,

the facts establish that the claim involves the defendant's violation of a broader social duty owed

to all individuals, which is imposed by the law of torts and, hence, exists regardless of the

contract, then it must be regarded as a tort." *Id.*

For the reasons discussed above, the rights and duties of the parties in this suit were set

forth in an enforceable contract, namely the 2012 CAA, and Vanguard abided by the terms of

that contract. Plaintiff's negligence and breach of fiduciary duty claims were pleaded as

alternative theories of liability. Therefore, plaintiff's motion for summary judgment will be

denied as to Count 3, and defendants' motion for summary judgment will be granted as to both

Counts 2 and 3.[28]

### b.  <u>Breach of Fiduciary Duty</u>

Even if the 2012 CAA were not an enforceable contract, however, summary judgment for

defendants on Count 3 would still be appropriate. In both Massachusetts and Pennsylvania, with

the exception of certain relationships such as that of attorney and client and trustee and

beneficiary, whether a fiduciary relationship existed is a question of fact. *See Gemini Invs., Inc.

v. Ches-Mont Disposal, LLC¸* 629 F. Supp. 2d 163, 168 (D. Mass. 2009) (citing *Indus. Gen.

Corp. v. Sequoia Pacific Sys. Corp.*, 44 F.3d 40, 44 (1st Cir. 1995)); *Yenchi v. Ameriprise Fin.,

Inc.*, 161 A.3d 811, 820 (Pa. 2017) ("The circumstances in which confidential relationships have

been recognized are fact specific and cannot be reduced to a particular set of facts or

circumstances.") (citation omitted). If a fiduciary relationship exists, the law requires that

---

[28] Defendants contend that the tort claims are also barred by Pennsylvania's two-year statute of limitations. However, because the Court finds that this is a contractual dispute, it need not address that argument.

fiduciary "to act with the utmost good faith in furthering and advancing the other person's interests." *Yenchi*, 161 A.3d at 820.

Here, the undisputed facts demonstrate that Vanguard was not acting as a fiduciary for Margaret. There is no evidence that Vanguard exercised "overmastering influence" such that Margaret was in a position of "weakness, dependence or trust" and forced to rely on defendants for account management or investment services. *Id.* Rather, as plaintiff acknowledges, Vanguard was a passive custodian of the funds deposited in the Kenneth and Margaret IRAs. (Docket No. 62, Ex. C at 260) ("Vanguard does nothing but sit on [the account]."). *Cf. Dudley Assocs., Ltd. v. Vanguard Grp.*, 1996 WL 532490, at *2 & n.4 (E.D. Pa. Sept. 19, 1996) ("It does not appear from plaintiff's allegations and submissions that Vanguard is a 'fiduciary' within the meaning of [ERISA]," as plaintiff failed to show defendant provided investment advice for compensation.).[29] A custodial arrangement creates only an "arm's length transaction," not the relationship of "trust and confidence" or "special circumstances" necessary to give rise to a fiduciary duty. *Lamm v. State Street Bank and Trust*, 749 F.3d 938, 951 (11th Cir. 2014). *See also In re Estate of Meinel*, 2016 WL 6108408, at *2 (Ariz. Ct. App. Oct. 19, 2016) ("there is no evidence [that the parties] had anything more than an arm's-length relationship typical of a customer and a service representative regarding a non-discretionary account").

Accordingly, Vanguard did not breach a fiduciary duty to Margaret.

### 3.    Consumer Fraud (Count 5)

Count 5 alleges that defendants engaged in unfair and deceptive actions in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 2. "Conduct is unfair

---

[29] The relationship between Vanguard and Margaret was more akin to that of bank and customer, and such a relationship generally does not give rise to a fiduciary duty. *See Bucci v. Wachovia Bank, N.A.*, 591 F. Supp. 2d 773, 783 (E.D. Pa. 2008).

or deceptive if it is 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness' or 'immoral, unethical, oppressive, or unscrupulous." *Cummings v. HPG Int'l Inc.*, 244 F.3d 16, 25 (1st Cir. 2001) (quoting *PMP Assoc. Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975)).

Count 5 also alleges that defendants violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 201-1 *et seq.*, which "is designed to protect the public from fraud and deceptive business practices." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 497 (3d Cir. 2013). The complaint asserts that Vanguard violated the UTPCPL's "catch-all" provision, 73 Pa. Stat. § 201-2(4)(xxi), which "provides a private right of action against a person [e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." *Id.* at 498 (quotation marks omitted). "To establish liability under the UTPCPL's catch-all provision a plaintiff must present evidence showing: (1) a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances; (2) justifiable reliance; and (3) that the plaintiff's justifiable reliance caused ascertainable loss." *Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D. 285, 292 (W.D. Pa. 2014).

a.     **Massachusetts General Laws Chapter 93A Does Not Apply**

Vanguard first contends that the governing contract includes a choice-of-law clause specifying that Pennsylvania law controls the disposition of any claims. In the alternative, Vanguard contends that under applicable choice-of-law principles, the consumer protection statute of Pennsylvania rather than Massachusetts applies.

 "When a Chapter 93A claim is founded on acts that resemble a traditional breach of contract action, the contract's choice of law provision applies." *Butler v. Balolia*, 2015 U.S. Dist. LEXIS 132907, at *1-2 (D. Mass. Sept. 30, 2015). As noted, Margaret is bound by the

terms and conditions of the 2012 CAA.  Section 8.5 of that contract included a choice-of-law

clause specifying that Pennsylvania law would govern the agreement.  (Docket No. 61, Ex. 3 at

23).  As then-Judge Breyer wrote, "[i]n the absence of a conflict with public policy,

Massachusetts honors choice-of-law provisions in contracts."  *Northeast Data Sys., Inc. v.

McDonnell Douglas Computer Sys. Co.*, 986 F.2d 607, 610 (1st Cir. 1993).  There is no apparent

conflict with any Massachusetts public policy here, as the "dispute is essentially a private one"

and there are no third-party effects.  *See id.*  Therefore, Pennsylvania's consumer protection

statute is the applicable statute.

Furthermore, even if the choice-of-law clause were not controlling, a choice-of-law

analysis shows that Chapter 93A is not applicable.  Because this is a diversity action, the Court

must apply the choice-of-law principles of the forum state.  *See Auto Europe, LLC v. Connecticut

Indem. Co.*, 321 F.3d 60, 64 (1st Cir. 2003).

"In determining which state's law governs claims that sound in contract, Massachusetts

courts consider a variety of factors . . . including the place of contracting, the place of negotiation

of the contract, the place of performance, the location of the subject matter of the contract, and

the domicil, residence, nationality, place of incorporation and place of business of the parties."

*Cornwall Entm't, Inc. v. Anchin, Block & Anchin, LLP*, 830 F.3d 18, 34 (1st Cir. 2016) (internal

citations and quotation marks omitted).  "And where claims sound in tort, Massachusetts courts

consider, among other things, the place where the injury occurred, the place where the conduct

causing the injury occurred, the domicil, residence, nationality, place of incorporation and place

of business of the parties, and the place where the relationship, if any, between the parties is

centered."  *Id.* (quotation marks omitted).

The real party in interest here is Margaret, an Ohio resident; her late husband Kenneth

was similarly an Ohio resident. The Vanguard entities are Pennsylvania corporations. The purported wrongdoing identified in the complaint occurred in Pennsylvania, and all alleged damages suffered by Margaret occurred in Ohio. The only connection Massachusetts has to this litigation is that Peter, acting as his mother's attorney-in-fact, is domiciled in this state. However, "[a]n attorney-in-fact is not a real party in interest. The attorney is merely an agent of the real party in interest and *does not possess interests sufficient to qualify for real party in interest status*." Moore's Federal Practice 3d § 17.10(4) (emphasis added). Therefore, applying Massachusetts choice-of-law principles, Chapter 93A is inapplicable.

Finally, and in any event, Chapter 93A applies only where the "unfair or deceptive act or practice occurred primarily and substantially" within Massachusetts. Mass. Gen. Laws ch. 93A § 11. As noted, the alleged wrongful conduct and resulting injuries occurred in Pennsylvania and Ohio, respectively.

Accordingly, with respect to the Chapter 93A subsection of Count 5, plaintiff's motion for summary judgment will be denied and defendants' motion for summary judgment will be granted.

> **b.** **Vanguard Did Not Violate the Pennsylvania Unfair Trade Practice and Consumer Protection Law**

Plaintiff contends that Vanguard violated the UTPCPL's catch-all provision through a "pattern of unfair and deceptive practices." (Pl.'s Mem. in Supp. at 18). The complaint identifies nine purported incidents of unfair and/or deceptive conduct. Among other things, plaintiff alleges that Vanguard refused to follow his instructions despite his compliance with Vanguard's policies, dishonored check no. 19198616, and breached its fiduciary duties. (Compl. ¶ 71).

Vanguard's conduct in this matter cannot be considered unfair or deceptive.[30]  The majority of the alleged violations, including the ones specified in the previous paragraph, overlap with plaintiff's breach of contract claim.  Because Vanguard did not breach the contract or the implied covenant of good faith and fair dealing as to those actions, it did not act unfairly or deceptively.

A generous reading of the complaint appears to identify three allegedly deceptive acts that are not merely duplicative of the breach of contract claim.  They are:  (1) "Vanguard's failure to disclose its policies and procedures concerning . . . a lawful power of attorney"; (2) "Vanguard's making unauthorized trades in the IRA"; and (3) "Vanguard's seizing dominion and control of, and interfering with [Margaret's] right to control and enjoy [ ] her inherited IRA." (*Id.*).  All three can be addressed in short order.

First, plaintiff contends that "Vanguard's IRA Disclosure Statement makes no reference to any restrictions on the use of a power of attorney to create or manage an IRA on behalf of another . . . [and] Vanguard disclosed its power of attorney rules only *after* it moved assets into a new IRA—and even then, did not fully disclose its policies."  (Pl.'s Mem. in Supp. at 18) (emphasis in original).  As noted, 2012 CAA did not disclose Vanguard's policies in detail, but simply granted the company the right to determine whether the form and manner of a request for distribution was acceptable.  However, Vanguard employee McHugh orally informed Peter of Vanguard's policy that powers of attorney were only good for one-time transactions on October 2, 2012, before the Margaret IRA was even created.  (Docket No. 65, Ex. 6 at 36).  McHugh further stated that although Peter had previously mailed a copy of the 2009 DGPOA, Vanguard

---

[30] Because the record shows that Vanguard's conduct was not deceptive, the Court need not address the parties' arguments concerning justifiable reliance and causation of ascertainable loss.

needed him to fill out an agent authorization form for ongoing account authority "because the power of attorney can be amended at any time." (*Id.*). After the Margaret IRA was created, another Vanguard employee, Rogan, confirmed McHugh's statements on November 12, 2012, adding that the 2009 DGPOA had to be certified by an attorney in order to be effective. (*Id.*, Ex. 25 at 19). These statements were formalized in writing on November 16, 2012. (Docket No. 65, Ex. 30 at 4). Therefore, Vanguard did in fact disclose its policies to plaintiff in the early stages of this dispute.

Second, Vanguard did not make any unauthorized trades. Plaintiff appears to suggest that Vanguard's decision to stop check no. 19198616 and return the $44,504.12 distribution to the Margaret IRA constituted a trade. However, that was not a trade, which requires the actual purchase or sale of securities or other assets, and Vanguard was entitled to pursue the course of action it chose under the governing contract.

Third, the claim that Vanguard seized control of Margaret's account is a mischaracterization of the facts. As discussed earlier, Vanguard declined to follow Peter's instructions until he could provide proper authentication to prove that he was authorized to act on his mother's behalf. Defendants neither withdrew money nor made any trades in the account, which grew in value from to $44,896 on the date of Kenneth's death to $68,699 on the date the funds were distributed. (Compl. ¶ 19; Docket No. 65, Ex. 1 ¶ 80).

Accordingly, with respect to the UTPCPL subsection of Count 5, there is no basis to conclude that Vanguard engaged in unfair or deceptive acts. Plaintiff's motion for summary judgment as to Count 5 will accordingly be denied and defendants' motion for summary judgment will be granted.

**V.**      <u>**Conclusion**</u>

For the foregoing reasons, plaintiff's motion to strike and motion for partial summary judgment are DENIED and defendants' motion for summary judgment is GRANTED.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor IV
Dated:  January 5, 2018            United States District Judge